## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. 1:05 CR 00204 |
| | ) | |
| PLAINTIFF | ) | JUDGE PETER C. ECONOMUS |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| EDWARD JACKSON, *et al.* | ) | AND ORDER |
| | ) | |
| DEFENDANTS | ) | |

This matter is before the Court upon the following three motions: (1) Defendant Matthews' [sic] Motion to Suppress Statements and/or Motion to Dismiss, see (Dkt. # 47); (2) Defendant Matthews' [sic] Motion to Suppress Evidence, see (Dkt. # 49); and Motion to Suppress Evidence filed by the Defendant, Edward Jackson, see (Dkt. # 60). The Court held an oral hearing regarding said motions on July 19, 2005 and therewith took the matter under advisement.

Having considered the evidence presented, the testimony of witnesses and the arguments of counsel, the Court hereby issues the following findings of fact and conclusions of law.

## I.      FACTUAL FINDINGS

On March 26, 2005, the Kansas State Highway Patrol conducted a traffic stop of a flat-bed semi-tractor trailer operating near Kansas City, Kansas.  See (Court's Ex. A, Tr. of Proceedings Had Before the Hon. Peter C. Economus, July 19, 2005 ("Tr.") at 5). The law enforcement officers thereafter discovered thirty-nine bales of marijuana secreted within a shipment of sheet insulation located on the trailer.  See (Tr. at 5).   Subsequent investigation revealed that the discovered marijuana weighed in excess of 749 pounds. See (Tr. at 5).

The driver of the semi-tractor trailer informed the law enforcement officers that he had met in Tucson, Arizona several weeks earlier with an individual known as Martin Guzman ("Guzman").  See (Tr. at 12); see also (Tr. of Proceedings Had Before the Hon. William H. Baughman, Friday, [April] 3, 2005 at 4-5).  Guzman allegedly had requested the driver to haul marijuana to Cleveland, Ohio in exchange for compensation. See (Tr. at 12).

At the request of law enforcement officers, the driver agreed to serve as a cooperating witness ("CW") and make a controlled delivery.  See (Tr. at 6).  The CW accordingly continued his journey to Cleveland accompanied by a law enforcement officer.  See (Tr. at 56).

Meanwhile, Acting Group Supervisor, Special Agent Harry Tidwell ("SA Tidwell") of the Department of Justice, Drug Enforcement Agency ("DEA") in Cleveland, Ohio contacted Cleveland DEA Special Agent William Leppla ("SA Leppla") to advise that a shipment of marijuana would be entering their jurisdiction on March 27, 2005.[1]  See (Tr. at 5).   SA Leppla

_____

[1]March 27, 2005 was Easter Sunday for various Christian faiths

received information that the delivery would occur on Aurora Road in Cleveland, Ohio near a warehouse marked by a parked brown tractor-trailer.  See (Tr. 6-7,  29-30, 32).  SA Leppla traveled to the Aurora Road area and, through a "process of elimination", determined that the delivery point was a warehouse, sub-divided into garages, located at 20905 Aurora Road, Warrensville Heights, Ohio.[2]  See (Tr. at 6, Def.'s Ex. F).

---

[2]SA Leppla testified at various stages of the hearing as to the description that he received regarding the destination:

| AUSA: | Now, you said by process of elimination.  Can you clarify that for us? |
|---|---|
| SA Leppla: | Well, we were told it was down Aurora Road, and that the exact address wasn't known until everyone showed up.  So by a description of how – where the driver told us that he was going to park, we were able to eliminate other areas and concentrate on the most likely. |

(Tr. at 7.)

****

| Defense Counsel: | What was the exact description you were given of the alleged delivery point? |
|---|---|
| SA Leppla: | That was one of the problems that we faced.  It wasn't an exact description.  It was off Aurora Road.  It was a warehouse, and it was across – near where a tractor-trailer was parked allegedly, and so through just the process of elimination, just trying to guess where you would actually park a tractor-trailer, we set up – I had no reason, no definitive information that told me that where I was sitting and watching was going to be that location. |

(Tr. at 29-30.)

****

-3-

SA Leppla and approximately five additional law enforcement officers proceeded to the Aurora Road location and established surveillance positions.[3]  See (Tr. at 7, 22-23).  At approximately 6:30 p.m., SA Leppla observed two vehicles – a black Chevrolet Trailblazer and a black/grey Chevrolet Suburban – enter the destination area.  See (Tr. at 8, 40-41).  SA Leppla further observed the driver of the Chevrolet Suburban, who he later described as an African-American male wearing a beige jumpsuit covered by a black coat, exit the vehicle and open the garage door.   See (Tr. at 8, 42-43).  The two vehicles entered the garage and each driver then stood in the outside area near the garage's entrance.   See (Tr. at 8-9).  After conversing for fifteen minutes, the pair returned to their vehicles and departed from the area.   See (Tr. at 62).

---

|  |  |
|---|---|
| Defense counsel: | So your guess as to where this place was, is it fair to say that it was based on two individuals arriving there on Sunday? |
| SA Leppla: | My guess as to where I set up was based on the location of the tractor-trailer that was parked on the south side of Aurora Road, and since that seemed to be one of the landmarks that I was given, that's what I keyed off of.<br>. . . .<br>I think that there were two trucks.  It's possible there were two trucks, but I was keying on it because it was described as a brown tractor. |

(Tr. at 31-32.)

[3]SA Leppla testified that the Easter Sunday holiday resulted in virtually no traffic occurring near the Aurora Road location; therefore, the officers established surveillance from various positions along an adjacent road to the north of the destination warehouse. See (Tr. at 8).

The CW meanwhile advised law enforcement officers that he did not know the identity of the intended recipients of the marijuana.  <u>See</u> (Tr. at 12, 55).  The CW further advised that he lacked any means in which directly contact the intended recipients.  <u>See</u> (Tr. at 12).  Consequently, the law enforcement officers equipped the driver with a microphone as well as a transmitter, and proceeded with the controlled delivery.  <u>See</u> (Tr. at 12, 21).[4]

At approximately 7:10 p.m., SA Leppla observed the CW arrive at the destination garage and park the semi-tractor trailer fifty to seventy-five feet away from the garage's entrance.  <u>See</u> (Tr. at 12, 38).  Five to ten minutes later, the black Chevrolet Suburban arrived operated by Matthews, while the black/grey Chevrolet Trailblazer arrived operated by Jackson.  <u>See</u> (Tr. at 13).  Jackson parked his vehicle in front of the garage's entrance and  Matthews parked the Chevrolet Suburban alongside the semi-tractor trailer.  <u>See</u> (Tr. at 14, 45-47).  The defendants exited their vehicles and engaged in an conversation with the CW near the flatbed trailer.  <u>See</u> (Tr. at 14).  Matthews walked into the garage, while Jackson and the CW began to remove the outside canvas straps from the area of the trailer carrying the marijuana.  <u>See</u> (Tr. at 14-15, 18, 23, 50-51). Jackson then began to walk toward the garage.  <u>See</u> (Tr. at 15-16, 25, 60).

SA Leppla immediately became concerned for the surveillance officers' safety as it rapidly was growing dark.  <u>See</u> (Tr. at 50).  He issued a predetermined signal and the law enforcement officers initiated the arrest of the defendants.  <u>See</u> (Tr. at 24-25).

_____

[4]DEA Special Agent Broderson ("SA Broderson") was assigned to monitor the transmitter from a location near the scene.  <u>See</u> (Tr. at 21).  SA Broderson did not testify during the hearing.  <u>See</u> (Tr. at 21).  SA Leppla lacked any knowledge of the contents of the transmission at the time he ordered the defendants' arrest.  <u>See</u> (Tr. at 24).

Law enforcement officers arrested Matthews in the inner bay area of the garage. See (Tr. at 16). SA Leppla arrested Jackson in a back room located within the garage. See (Tr. at 16, 25-26). SA Leppla read from a card advising each defendant of the rights secured by Miranda v. United States, 384 U.S. 436 (1966). See (Tr. at 54, 72).

A subsequent search of Matthews's person revealed mobile telephones and $3,235.00 in U.S. currency. See (Tr. at 18). A search of Jackson's person uncovered keys and personal effects. See (Tr. at 18).

Law enforcement officers proceeded to search the Chevrolet Suburban and discovered an open trunk area covered with an unfurled, blue tarp. See (Tr. at 19). A search of the Chevrolet Trailblazer revealed a small amount of marijuana, a back duffle bag, four or five boxes of clear plastic bags, and cellophane sharing characteristics to that covering the marijuana. See (Tr. at 18-19). The law enforcement officers subsequently transported the defendants to the Warrensville Heights Jail. See (Tr. at 67-68).

SA Leppla appeared before United States Magistrate Judge William H. Baughman, Jr. on March 28, 2005 and swore out a criminal complaint against the defendants alleging violations of 21 U.S.C. § 841(a)(1), (b)(1)(B). See (Dkt. # 1). Magistrate Judge Baughman immediately issued arrest warrants for the defendants. See (Tr. at ).

On March 28, 2005, TFO Ansari transported the defendants from jail to the United States Marshall's Office in Cleveland, Ohio where they were scheduled to meet with a United States Pretrial Services Officers prior to arraignment. See (Tr. at 67-68). En route, Matthews enquired as to the reasons for his arrest. See (Tr. at 67-68). TFO Ansari testified:

-6-

> After getting Mr. Jackson and Mr. Matthews released from the Warrensville Heights PD, we were transporting them. And Mr. Matthews said – asked why he was being arrested.
>
> I then explained that we were going, to the marshals, about being interviewed by Pretrial Services, and I advised Mr. Matthews that he had been advised the day before by Special Agent Leppla of his rights, of his Miranda rights. He said he understood. I asked Mr. Jackson the same. He stated he understood.
>
> I then advised them both of their Miranda rights again, and I said, "I'm going to give you a clue: Have you ever been to Tucson?"

(Tr. at 67-68); see also (Tr. at 73, 77, 79; Def.'s Ex. GG).

Matthews responded that he had been in Tucson, Az. three weeks before, "but he didn't make a deal." (Tr. at 68.) TRO Ansari responded that he "didn't ask [Matthews] about any deal." (Tr. at 77.) Matthews asked TFO Ansari if "there was anything wrong with going to Tucson." (Tr. at 69.) TFO Ansari replied, "[N]o you can go wherever you want. But realize, the reason we are saying that, we must have some idea that I said have you ever been to Tucson." (Tr. at 69.)

The defendants thereafter appeared before Magistrate Judge Baughman, represented by counsel, for initial appearances. See (Dkt. # 4). Upon oral motion of the Government, Magistrate Judge Baughman ordered the temporary detention of each defendant. See (Dkt. # 5).

Following a detention hearing held on March 31, 2005, Magistrate Judge Baughman

-7-

issued an order placing Matthews into the custody of the Attorney General.[5]  See (Dkt. # 7). Magistrate Judge Baughman additionally held a preliminary examination whereby he found probable cause for the case to be bound over to the Grand Jury for the United States District Court for the Northern District of Ohio (the "Grand Jury").

On April 27, 2005, the Grand Jury issued an Indictment charging the defendants with one count of possession with the intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B).

On June 14, 2005, the Grand Jury issued a Superceding Indictment charging the defendants with one count of attempted possession with the intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) & 846.  See (Dkt. # 54).

The instant motions ensued.

## II.       LAW AND ANALYSIS

"'It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression.'"  United States v. Rodriguez-Suazo, 346 F.3d 637, 643 (6th Cir. 2003) (quoting United States v. Feldman, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). The defendants each have filed separate motions seeking the suppression of:

> any and all evidence derived from the arrest and seizure of the [] defendant[s], the
> search of the business premises owned by Jackson . . . , and the search of the

---

[5]Magistrate Judge Baughman ordered the Defendant Edward Jackson released on a $15,000.00 unsecured bond with pre-trial supervision and conditions.  See (Dkt. # 7; Dkt. # 8).

vehicles, including the Trailblazer and Suburban, because this alleged evidence is the fruit of an unconstitutional stop and arrest as well as unconstitutional searches and seizures since the officers violated the defendants' fourth and fourteenth amendment constitutional rights to be free from unreasonable stops, arrests, searches and seizures of their person, the Defendant Edward Jackson's business and all of the vehicles there, including the Trailblazer and the Suburban.

(Dkt. # 49 at 3.)  Matthews further has filed a motion seeking the suppression of "any and all statements made by [him] on or about March 28, 2005, which the government may seek to introduce into evidence at the trial of the above-captioned case, the taking of which was violative of the rights guaranteed the Defendant by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution."  (Dkt. # 47 at 1.)

###     A.      Scope of the Hearing

As a threshold matter, the Court shall address the scope of the defendants' motions to suppress.  Specifically, the Court observed during the hearing that the motions challenged the searches of all vehicles present at the scene of the arrests, which seemingly included the semi-tractor trailer operated by the CW.  See (Tr. at 2).  Upon the Court's identification of the issue, counsel for each defendant indicated on the record that his respective motion did not challenge any search or evidence seized from the semi-tractor trailer.  See (Tr. at 2).  The Court next observed that the Government had raised the issue of standing – particularly, in regard to whether Matthews properly could challenge evidence seized from Jackson's vehicle and whether Jackson could challenge evidence seized from Matthews's vehicle.  See (Tr. at 3).  The Court enquired: "Now before I begin, I want a statement from counsel, so I can narrow down what the issues are this afternoon, and specifically, is Matthews challenging the arrest, the

-9-

evidence seized from his person and vehicle [the Chevrolet Suburban], as well as his post arrest statements?"  <u>See</u> (Tr. at 3).  Counsel for Matthews responded in the affirmative.  <u>See</u> (Tr. at 3).  The Court went on: "And Jackson is challenging his arrest, evidence seized from his person, vehicle [the Chevrolet Trailblazer]  and evidence seized from the garage; is that correct?"  <u>See</u> (Tr. at 3).  Counsel for Jackson responded in the affirmative.  <u>See</u> (Tr. at 3).  The Court further observed that the defendants sought the suppression of evidence seized from the garage; however, testimony provided during the preliminary hearing revealed that no contraband had been seized from the garage.  <u>See</u> (Tr. at 3-4).  Counsel for each defendant again indicated on the record that he was not seeking the suppression of any evidence seized from the garage.  <u>See</u> (Tr. at 4).

Accordingly, the Court determined that the narrowing of the issues resolved the issue of standing, as well as eliminated the need to address the exclusion of evidence seized from the garage and the semi-tractor trailer.

### B.     Fourth Amendment – The Arrest of the Defendants

The initial substantive issue before the Court, therefore, is whether the law enforcement officers had probable cause to effectuate the defendants' arrest on March 27, 2005.  The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  Case law arising under the Fourth Amendment generally recognizes three categories of police-citizen encounters: (1) consensual encounters where an officer seeks voluntary cooperation of a citizen and requires no suspicion at all, see <u>Florida v. Royer</u>, 460

U.S. 491, 493 (1983); (2) an investigatory stop which is a limited, non-intrusive detention and requires reasonable suspicion based on articulable facts (i.e. the classic <u>Terry</u> stop), <u>see</u> <u>Terry v. Ohio</u>, 392 U.S. 1 (1968); and (3) an arrest which requires probable cause pursuant to the Fourth Amendment, <u>see</u>  <u>United States v. Flowers</u>, 909 F.2d 145, 147 (6th Cir. 1990). The record before the Court reveals that the lone encounter present in the case *sub judice* concerns whether the law enforcement officers had probable cause to effectuate the warrantless arrests of the defendants.[6]

An "arrest without a warrant does not violate the Fourth Amendment if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law."[7] <u>Criss v. City of Kent</u>, 867 F.2d 259, 262 (6th Cir. 1988); <u>see also</u> <u>Williams ex rel. Allen v. Cambridge Bd. of Educ.</u>, 370 F.3d 630, 636 (6th Cir. 2004) (holding that a law enforcement officer "may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime").  The validity of a warrantless arrest therefore depends on whether  "at the moment the arrest was made, the officers had probable cause to make it -- whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man

---

[6]There lacks any evidence before the Court demonstrating that the defendants consented to the encounter with the law enforcement officers.  Similarly, the testimony provided at the hearing indicates that the law enforcement officers arrested the defendants upon initial contact. Thus, neither consent nor  investigatory / <u>Terry</u> searches are at issue.

[7]Likewise, DEA agents may make warrantless arrests for any felony if the agents have probable cause to believe that the person has committed or is committing a felony. <u>See</u> 21 U.S.C. § 878(a)(3).

in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964).

Probable cause is "a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). See also United States v. Cortez, 449 U.S. 411, 418 (1981) ("The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are law enforcement officers."). Thus, in determining whether probable cause exists, the trial court must look to the "totality of the circumstances," Gates, 462 U.S. at 230-31, and view the facts "as a whole and in a practical manner," United States v. Pepple, 707 F.2d 261, 263 (6th Cir. 1983).

"[A] mere allegation [of criminal behavior], while possibly justifying a brief investigatory detention, is insufficient by itself to establish probable cause that a crime had been committed." Radvansky v. City of Olmsted Falls, 395 F.3d 291, 305 (6th Cir. 2005). In order establish probable cause in the face of such a naked allegation, an officer must investigate further and find objective factors to corroborate the claim. See id. at 308-09.

The record reveals a number of factors supporting a finding that a reasonable officer observing the events of March 27, 2005 would believe, as SA Leppla did, that he was witnessing the defendants commit a criminal offense. First, SA Leppla received information that a known CW: (1) was in the possession of a large quantity of marijuana; (2) would arrive on March 27,

-12-

2005 at a location on Aurora Road marked by a parked brown tractor-trailer; and (3) would deliver the marijuana to two unknown individuals on March 27, 2005. Cf. United States v. Couch, 367 F.3d 557, 560-61 (6th Cir. 2004) (holding that a known informant is inherently more credible because the informant "could potentially be held accountable for providing false information"). SA Leppla corroborated the CW's information by observing a brown tractor-trailer parked near a warehouse on Aurora Road. See United States v. Weaver, 99 F.3d 1372, 1377 (6th Cir. 1996) (finding that information received from an informant whose prior reliability is not established may be sufficient to create probable cause when there is some independent corroboration by the police of the informant's information). Additionally, upon establishing surveillance in the area, SA Leppla observed two individuals arrive at the destination shortly before the anticipated arrival of the CW and begin milling about as if they were awaiting for a shipment. The pair left the location and returned moments after the CW arrived with marijuana. At least one of the defendants (Jackson) began conversing with the CW. Jackson then attempted to remove the canvas straps only from the center-area of the trailer which contained the marijuana. Based on the foregoing factors, the Court concludes that the law enforcement officers had a reasonable belief that each defendant was taking part in a criminal offense.

The defendants attempt to minimize the apparent criminal nature of their activities by presenting the testimony of Dartanyan Thompson ("Thompson"), who alleged that it was he – as opposed to Matthews – that accompanied Jackson to the warehouse garage prior to the CW's arrival. See (Tr. at 96). SA Leppla testified that the arrival of the defendants prior to the CW

-13-

factored heavily in his calculus that criminal activity was afoot.  See (Tr. at 43).  It follows, according to the defendants, that Matthews's purported absence from the scene during the initial visit diminishes any finding of probable cause.

Having the opportunity to observe the demeanor of the witnesses and assess the entirety of the record, the Court declines to afford Thompson's testimony any weight.  While Thompson vividly recalled details regarding his visit to the garage with Jackson, his sporadic testimony regarding other events of the evening greatly diminished his credibility.  For example, Thompson recalled permitting Matthews to drive his Chevrolet Suburban from a dinner party on March 27, 2005, see (Tr. at 86); however, he could not recall any details of the party such as other persons who attended the event, see (Tr. at 93, 99-100).  The deficiencies present in Thompson's testimony are particularly troublesome in light of the revelation that Thompson and Jackson have met since the arrest.  See (Tr. at 96-98).  In short, the Court lacks any credible basis to find that Thompson was the individual that accompanied Jackson to warehouse garage prior to the CW's arrival.

In a final attempt to demonstrate that the law enforcement officers lacked probable cause to effectuate the arrest, the defendants emphasize the perceived shortcomings in SA Leppla's investigation, including: the failure to obtain a warrant prior to the CW's arrival; the lack of any audible tape recording, videotape and, or photographs of the alleged transaction; and SA Leppla's alleged haste in ordering the arrest prior to defendants taking possession of the marijuana.  While these arguments may have some bearing on the ultimate determinations to be made by the jury, for present purposes, probable cause exists where an officer reasonably

-14-

believes that an individual has committed a violation, even if in hindsight this was not the case. See Klein v. Long, 275 F.3d 544, 550 (6th Cir. 2001) ("Probable cause is assessed from the perspective of a reasonable officer on the scene, 'rather than with the 20/20 vision of hindsight.'") (quoting Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir. 2001)). Moreover, "[o]fficers are not required to rule out every possible explanation other than a suspect's illegal conduct before making an arrest." United States v. Reed, 220 F.3d 476, 478 (6th Cir. 2000). As discussed *supra*, the circumstances known to the law enforcement officers at the time of the defendants' arrest fall well within the perimeters of established and controlling law supporting a finding of probable cause.[8]  Accordingly, the Court finds that the law enforcement officers had probable cause to effectuate the warrantless arrests of Jackson and Matthews on March 27, 2005.

### C.       Fourth Amendment – Search of the defendants' persons

The defendants next challenge the search of their persons following the arrests.  The Court initially notes that no evidence other than keys and personal papers were seized from

---

[8]The Court observes that Matthews's motion opaquely suggests that the Court should employ the Fourth Amendment standards applicable to warrantless searches and seizures in the home as opposed to warrantless arrests in public places. See (Dkt. # 49 at 5-6). The presence of probable cause and extraordinary circumstances is necessary to comply with the stringent standards governing warrantless searches and seizures in the home. See United States v. Chambers, 395 F.3d 563 (6th Cir. 2005). Setting aside the issues as to whether the standard is applicable to Jackson's "business" and whether Matthews, as a guest, can raise the issue, the facts of this case nonetheless establish that such extraordinary circumstances are present. See Ingram v. City of Columbus, 185 F.3d 579 (6th Cir. 1999) (holding that extraordinary circumstances existed where law enforcement officers observed a perceived drug transaction in a public space and pursued suspects into home for the purposes of effectuating warrantless arrest).

-15-

Jackson's person.  <u>See</u> (Tr. at 18).  However, the law enforcement officers seized U.S. currency in the amount of $3,235.00 and several mobile telephones from Matthews's person. <u>See</u> (Tr. at 18).  The Government proposes to offer such evidence in support of its theory that the defendants were engaged in a drug transaction at the time of the arrests.

In light of the finding that the law enforcement officers had probable cause to effectuate the arrests, the Court concludes that the law enforcement officers possessed the authority to search the defendants' persons incident to those arrests.  It is well-established that once a suspect is arrested based on the existence of probable cause, officers may conduct a warrantless search of the suspect's person and of the area within the suspect's immediate control absent a warrant. <u>See</u> <u>e.g.</u>, <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 35 (1979); <u>Chimel v. California</u>, 395 U.S. 752, 762-63 (1969).  As the challenged evidence was seized during a direct search of the defendants' persons at the time of the arrests, it follows <em>a fortiori</em> that such searches and seizures were valid pursuant to the search incident to arrest exception to the warrant requirement.

> **D.     Fourth Amendment – Search of the Chevrolet Suburban and Chevrolet Trailblazer**

The defendants' challenges to the searches of the Chevrolet Suburban and Chevrolet Trailblazer require greater analysis.  SA Leppla testified that he lacked any information that provided him with independent probable cause to search the vehicles operated by the defendants.  <u>See</u> (Tr. at 27).  SA Leppla repeatedly testified, however, that the law enforcement officers searched the vehicles incident to the defendants' arrest. <u>See</u> (Tr. at 65-66).

In <u>New York v. Belton</u>, 453 U.S. 454 (1981), the United States Supreme Court addressed the search incident to arrest rule in the context of automobile search and held that where a lawful arrest of the occupant of an automobile has occurred, the search may extend to the passenger compartment of that automobile.  453 U.S. at 460.  The rationales underlying <u>Belton</u>'s limited search incident to arrest exception, officer safety and preservation of evidence, generally justify the infringement of any privacy interest the arrestee may have in the contents of the automobile. <u>See</u> <u>Belton</u>, 453 U.S. at 461.

The Supreme Court recently has decided that <u>Belton</u> governs even where an officer does not make contact until the person has left the vehicle.  <u>See</u> <u>Thorton v. United States</u>, 541 U.S. 615, 622 (2004).  Indeed, "[s]o long as an arrestee is the sort of 'recent occupant' of a vehicle, . . . officers may search that vehicle pursuant to the arrest." <u>Thorton</u>, 541 U.S. at 623-24.

Notwithstanding the "legions" of cases attempting to determine the precise contours of "recent occupant", no bright-line rule has emerged.  <u>See</u> <u>generally</u> <u>Thorton</u>, 541 U.S. at 625-632 (Scalia, J., concurring in the judgment).  The United States Court of Appeals for the Sixth Circuit has interpreted <u>Thorton</u> as permitting law enforcement officers to search the passenger compartment of a pick-up truck where the driver was more than five feet away from the vehicle at the time of initial contact with law enforcement officers and where the search of the pick-up truck occurred after the defendant was handcuffed and taken into custody.  <u>See</u> <u>United States v. Herndon</u>, 393 F.3d 665 (6th Cir.), <u>cert. granted, vacated and rev'd on other grounds</u>, 125 S. Ct. 2279,161 L. Ed. 2d 1054 (2005); <u>see</u> <u>also</u>, <u>Thorton</u>, 541 U.S. at 617-18 (holding that proper search incident to arrest occurred where driver outside of vehicle at time of initial

-17-

conduct with law enforcement and search of vehicle occurred while defendant was handcuffed and sitting in rear of police cruiser).

Applying the foregoing principles to the case at bar, the Court finds that the law enforcement officers' searches of the Chevrolet Suburban and Chevrolet Trailblazer were lawful searches incident to the defendants' arrests.  SA Leppla twice observed the defendants arrive on the scene in the vehicles.  According to SA Leppla's testimony, the defendants were arrested outside of their vehicles "shortly after the arrival" at approximately 7:15 p.m.  (Tr. at 15.)  SA Leppla further testified that "[n]ot very much time had passed" between the defendant's arrival and the arrests.  (Tr. at 15).  The defendants immediately were placed into custody and the vehicles promptly searched.  As in the cases of <u>Thorton</u> and <u>Herndon</u>, SA Leppla's observations demonstrate that the defendants were "recent occupants" of the vehicles at the time of the arrests.  Consequently, this Court upholds the validity of the vehicle searches as properly conducted incident to arrest.[9] [10]

---

[9]Upon questioning by the Court, SA Leppla recalled that the law enforcement officers also conducted inventory searches of the vehicles.  <u>See</u> (Tr. 65-66).  One well-defined exception to the warrant requirement is the inventory search, which is defined as the "search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." <u>United States v. Whren</u>, 517 U.S. 806, 811 n. 1 (1996).  Inventory searches are reasonable so long as they are administered in good faith, according to reasonable, standardized criteria. <u>See Colorado v. Bertine</u>, 479 U.S. 367, 374, (1987). The government has the burden of showing that the inventory search was conducted pursuant to standardized criteria. <u>See United States v. Gregory</u>, 983 F.2d 1069, 1992 WL 393144, at *7 (6th Cir. 1992).

It is uncontroverted that the law enforcement officers impounded the vehicles and locked the same inside the garage at the scene of the arrest.  <u>See</u> (Tr. at 65-66). Nevertheless, while the Government appears in hindsight to contend that the searches of

### E.    Fifth Amendment – Matthews's purported statements to TFO Ansari

The final suppression issue before the Court concerns statements purportedly made by Matthews while traveling with TFO Ansari to the United States Marshall's service on March 28, 2005.  Specifically, Matthews's purported statements tend to demonstrate that he was in Tucson, Arizona several weeks prior to the arrests and that "he didn't make a deal" during that time.  (Tr. at 77.)  Two factors render these statements potentially inculpatory: (1) the CW indicated that the marijuana originated from Tucson, Arizona; (2) the CW informed the law enforcement officers subsequent to the arrests that he observed Matthews in the company of Guzman (the source of the marijuana) while in Tucson, Arizona.  See  (Tr. at 57.)  In seeking the suppression of these potentially inculpatory statements, Matthews contends that   "the agents never advised him of his Miranda rights.  Thus because the interrogation of him was custodial this Honorable Court must suppress all statements allegedly made by [] Matthews during the agents' interrogation."  See (Dkt. # 47 at 5).

---

the vehicles were valid inventory searches, it did not present any evidence at the hearing as to the standardized procedures for such searches.  In addition, the Government did not present evidence as to whether the law enforcement officers acted in compliance with such procedures at the time of the search.  Indeed, it was the Court, as opposed to the Government, which raised the issue of inventory search.  Perhaps of greater significance, the Government did not offer as evidence the inventory reports purportedly made at the time of the searches.  Absent such evidence, the Court finds that the Government did not meet its burden of proving that the searches of the vehicles fall within the inventory search exception to the warrant requirement.

[10]While the Court concludes that the searches of the vehicles were valid under the Fourth Amendment, such a determination does not necessarily govern the admissibility of evidence under the Federal Rules of Evidence.

It is a fundamental tenet of our criminal justice system that a defendant may not be "compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Supreme Court held in Miranda, 384 U.S. at 478-79, that a suspect subject to custodial interrogation must first be given notice of his or her right against self-incrimination. Statements obtained during custodial interrogation in violation of Miranda may not be admitted for certain purposes in a criminal trial. Id. at 479. However, the obligation to administer a Miranda warning to a suspect only arises "where there has been such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam).

In determining whether a defendant was subject to custodial interrogation, the Court looks to the totality of the circumstances to determine "how a reasonable man in the suspect's position would have understood the situation." United States v. Phillip, 948 F.2d 241, 247 (6th Cir. 1991). The "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation marks omitted)).

The first factor the court considers is whether a reasonable person in the defendant's position would feel free to leave. United States v. Crossley, 224 F.3d 847, 861 (6th Cir. 2000). Other factors the Court takes into consideration include:

(1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the

questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police . . . [or] acquiesced to their requests to answer some questions.

Id. (internal quotations omitted).

It is undisputed that Matthews was in custody at the time that he purportedly made statements to TFO Ansari.  See (Tr. at 73); (Dkt. # 61 at 12).  Matthews's lone challenge appears to rest on his assertion that he was not advised of his Miranda rights at any time prior to making the statements.  See (Dkt. # 47 at 8-9).

The Court finds as credible, however, SA Leppla's testimony that he advised Matthews and Jackson of the rights secured by Miranda at the time of the arrests.  See (Tr. at 54); see also (Tr. at 72).  The Court nevertheless rejects TFO Ansari's account that he re-advised the defendants of their Miranda rights on the morning of March 28, 2005.[11]

The parties nonetheless have not addressed the effect of the Miranda warnings provided

_____

[11]TFO Ansari testified that he reminded the defendants of the Miranda warnings provided by SA Leppla, as well as re-advised the defendants of the Miranda warnings. See (Tr. at 73,76).  According to TFO Ansari, the defendants indicated that they understood their Miranda rights and Matthews proceeded to volunteer the challenged statements.  See (Tr. at 67-69).  Having the opportunity to examine the demeanor of the witness in regard to this particular exchange, the Court deems such testimony as unreliable.  While TFO Ansari initially testified as to the particulars of his exchange with Matthews, cross-examination revealed that TFO Ansari did not provide a full account of his conversations with the defendants. For example, TFO Ansari testified on cross-examination that he discussed a significant number of issues with the defendants including, possible sentencing exposure in the federal system based upon the amount of marijuana seized, and that the defendants would soon have counsel.  See (Tr. 74-75). The incomplete nature of TFO Ansari's testimony, coupled with his demeanor while testifying, renders his entire testimony unreliable.

by SA Leppla on the evening of March 27, 2005 on the statements purportedly made by Matthews the following morning. When addressing the issue of the delay between SA Leppla's reading of the <u>Miranda</u> rights on the evening of March 27, 2005 and Matthews's statements to TFO Ansari the following morning, the Court must consider the totality of the circumstances. <u>See</u> <u>United States v. Weekly</u>, 130 F.3d 747, 750 (6th Cir. 1997). There lacks any *per se* rule as to the length of delay which requires the re-advisement of the defendant's <u>Miranda</u> rights. <u>Id</u>. at 750.

In considering the totality of the circumstances, the Court finds that no changed circumstances occurred in the approximately twelve hour period between SA Leppla advising Matthews of his <u>Miranda</u> rights and Matthews's purported dialogue with TFO Ansari the following morning. Indeed, the parties have not presented any evidence as to the events which transpired from the time of arrest until March 28, 2005. The conclusive facts presented in the record are that SA Leppla advised the defendants of their <u>Miranda</u> rights shortly after 7:15 p.m. on March 27, 2005 in the presence of TFO Ansari, and on the following morning TFO Ansari and Matthews engaged in a conversation that yielded statements potentially inculpating Matthews in criminal activity. Such facts do not require the re-advisement of <u>Miranda</u> warnings. <u>See</u> <u>Weekly</u>, 130 F.3d at 750 (<u>Miranda</u> rights need not be repeated before an interview occurring one hour after initial advisement of rights); <u>United States v. Clay</u>, 408 F.3d 214 (5th Cir. 2005) (two day lapse between <u>Miranda</u> warnings and questioning sufficient); <u>Mitchell v. Gibson</u>, 262 F.3d 1036, 1057-58 (10th Cir. 2001) (noting that "numerous courts have rejected the argument that the passage of time alone invalidates previously given Miranda

-22-

warnings" and citing cases); United States v. Andaverde, 64 F.3d 1305, 1313 (9th Cir. 1995) (holding statements the defendant made to his parole officer the day after the defendant received a Miranda warning to be admissible); United States ex rel. Patton v. Thieret, 791 F.2d 543, 547-48 (7th Cir. 1986) (Miranda rights did not need to be reread after forty minute lapse); Evans v. McCotter, 790 F.2d 1232, 1237-38 (5th Cir.1986) (rights voluntarily waived where suspect was twice advised of rights over a three-hour period notwithstanding change of interview locations); Jarrell v. Balkcom, 735 F.2d 1242, 1254 (11th Cir. 1984) (change in interrogators and three-hour lapse did not render confession inadmissible); see also United States v. Harris, No. 92-5326, 1992 U.S. App. LEXIS 32877 (Dec. 8, 1992) (no re-advisement of Miranda rights necessary where interrogation began three days after initial Miranda warnings).

Having determined that Matthews was advised of his Miranda rights prior to the time he made any statements to TFO Ansari, the Court concludes that the contentions advanced in the pending motion to suppress relating to Matthews's statements are without merit.  The Court further concludes that no issue of waiver of Miranda rights is present because there is no evidence that Matthews, either expressly or impliedly, invoked his right to remain silent.  See United States v. Hurst, 228 F.3d 751, 759-60 (6th Cir. 2000) (waiver analysis not applied where the defendant did not clearly and unequivocally assert his right to remain silent).

### III.   CONCLUSION

For the foregoing reasons, the Defendant Matthews' [sic] Motion to Suppress Statements and/or Motion to Dismiss, see (Dkt. # 47); the Defendant Matthews' [sic] Motion

to Suppress Evidence, <u>see</u> (Dkt. # 49); and the Motion to Suppress Evidence filed by the

Defendant, Edward Jackson, <u>see</u> (Dkt. # 60), are **DENIED**.


      **IT IS SO ORDERED**.

                                   **s/ Peter C. Economus - August 4, 2005**

                                   **PETER C. ECONOMUS**

         `                        **UNITED STATES DISTRICT JUDGE**