# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CASE NO. 1:05 CR 00204** |
| | ) | |
| **PLAINTIFF** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **EDWARD JACKSON,** *et al.* | ) | **AND ORDER** |
| | ) | |
| **DEFENDANTS** | ) | |

This matter is before the Court upon the following motions and post-trial memoranda:

(1) Defendant's Edward Jackson Motion for a New Trial or in the Alternative Judgment of

Aquittal [sic], see (Dkt. # 115); (2) Defendant Ernest Matthews' Motion to Join Defendant

Edward Jackson's Motion for New Trial or in the Alternative Judgment of Acquittal, see

(Dkt. # 116); (3) Defendant Matthews' Motion to Set Aside the Verdict and Enter a Judgment

of Acquittal and/or Motion for New Trial, see (Dkt. # 117); (4) Government's Response to

Defendants' Motion for New Trial, see (Dkt. # 125); (5) Defendant Matthews' Reply on

Motion to Set Aside the Verdict and Enter a Judgment of Acquittal and/or Motion for New

Trial, see (Dkt. # 126); (6) Government's Response to Defendant Matthews' Reply on

Motion for Judgment of Acquittal and/or Motion for New Trial, see (Dkt. # 127); (7)

Defendant Edward Jackson's Motion to Join Defendant's Response (Reply) to Government's

Motion in Opposition to Defendant's Motion for a New Trial, see (Dkt. # 131); (8) Defendant Matthews' Second Motion for New Trial, see (Dkt. # 139); (9) Defendant Edward Jackson's Supplement to his Motion for a New Trial, see (Dkt. # 142); (10) Government's Response to Defendant Matthews' Second Motion for New Trial, see (Dkt. # 143); (11) Defendant Matthews' Reply to Second Motion for New Trial, see (Dkt. # 146); (12) Defendant Matthews' Supplement to Reply for Second Motion for New Trial, see (Dkt. # 148); (13) Defendant Edward Jackson's Motion to Join Defendant Ernest Matthews' Reply to Government's Response to Second Motion for New Trial, see (Dkt. # 149); (14) Government's Response to Defendants' Motion for a New Trial, see (Dkt. # 158); (15) Second Supplemental Motion for a New Trial Based on Newly Discovered Evidence, see (Dkt. # 160); (16) Defendant Matthews' Reply to Government's Response to Second Motion for New Trial, see  (Dkt. # 164); (17) Defendant Ernest Matthews Motion to Join Defendant Edward Jackson's Second Supplemental Motion for a New Trial Based on Newly Discovered Evidence, see (Dkt. # 165); (18) Defendant Edward Jackson's Motion to Join Defendant Ernest Matthews' Reply to Government's Response to Second Motion for New Trial, see (Dkt. # 167); (19) Defendant Matthews' Post-Hearing Brief, see (Dkt. # 176); (20) Post Hearing Supplemental Brief, see (Dkt. # 177); (21) Government's *Corrected* Response to Defendants' Post-Hearing Briefs, see (Dkt. # 180); (22) Defendant Matthews' Reply to Government's Corrected Response, see (Dkt. # 183); and (23) Defendant's Reply to Government's Response Post Hearing Briefs, see (Dkt. # 184).  The Court held a hearing regarding the foregoing motions and filings on May 31, 2006.  The parties concluded their

-2-

briefing of the matter on July 17, 2006.

## I.     BACKGROUND

Special Agent William Leppla ("SA Leppla") of the Department of Justice, Drug Enforcement Agency ("DEA") in Cleveland, Ohio appeared before United States Magistrate Judge William H. Baughman, Jr. on March 28, 2005 and swore out a criminal complaint against the defendants, Edward Jackson ("Jackson") and Ernest Matthews ("Matthews"), alleging violations of 21 U.S.C. § 841(a)(1), (b)(1)(B).  See (Dkt. # 1).  Magistrate Judge Baughman immediately issued arrest warrants for the defendants.  See (Dkt. # 2; Dkt. # 3).

The defendants thereafter appeared before Magistrate Judge Baughman, represented by counsel, for initial appearances.  See (Dkt. # 4).  Upon oral motion of the Government, Magistrate Judge Baughman ordered the temporary detention of each defendant.  See (Dkt. # 5).

Following a detention hearing held on March 31, 2005, Magistrate Judge Baughman issued an order placing Matthews into the custody of the Attorney General.  See (Dkt. # 7). Magistrate Judge Baughman ordered the Defendant Edward Jackson released on a $15,000.00 unsecured bond with pre-trial supervision and conditions.  See (Dkt. # 7; Dkt. # 8). Magistrate Judge Baughman additionally held a preliminary examination whereby he found probable cause for the case to be bound over to the Grand Jury for the United States District Court for the Northern District of Ohio (the "Grand Jury").

On April 27, 2005, the Grand Jury issued an Indictment charging the defendants with one count of possession with the intent to distribute marijuana in violation of 21 U.S.C. §

841(a)(1), (b)(1)(B).  <u>See</u> (Dkt. # 12).

On June 14, 2005, the Grand Jury issued a Superceding Indictment charging the defendants with one count of attempted possession with the intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) & 846.  <u>See</u> (Dkt. # 54).

The Court held a suppression hearing on July 19, 2005.  The Court denied the defendants' motions to suppress by a written Memorandum Opinion and Order issued August 4, 2005.  <u>See</u> (Dkt. # 72).

Trial commenced on September 13, 2005.

*The Government's Theory of the Case*

Assistant United States Attorney Linda Barr presented the Government's theory of the case during her opening statement.  Specifically, the Government alleged that on March 26, 2005, the Kansas State Highway Patrol conducted a traffic stop of a flat-bed semi-tractor trailer operating near Kansas City, Kansas.  <u>See</u> (Tr. of Trial ("Tr.") at 146-47). The law enforcement officers thereafter discovered thirty-nine bales of marijuana secreted within a shipment of sheet insulation located on the trailer.  <u>See</u> (Tr. at 147).  Each bundle weighed approximately 19 or 20 pounds.  <u>See</u> (Tr. at 147).

The driver of the semi-tractor trailer – identified during the opening statement as Arnulfo Quintana ("Quintana")[1] – informed the law enforcement officers that he had met in Tucson, Arizona several weeks earlier with an individual known as Martin Guzman

---

[1]As discussed *infra*, the Government provided the defense with Quintana's identity immediately prior to jury selection.

-4-

("Guzman"). <u>See</u> (Tr. at 146-48). Guzman had requested Quintana to haul marijuana to Cleveland, Ohio in exchange for compensation. <u>See</u> (Tr. at 148). Quintana had a second meeting with Guzman in Tucson, Arizona during March 2005 whereby he encountered the Defendant, Ernest Matthews. <u>See</u> (Tr. at 149).

At the request of law enforcement officers, Quintana agreed to serve as a cooperating witness and make a controlled delivery. <u>See</u> (Tr. at 147-48). Quintana accordingly continued his journey to Cleveland accompanied by a law enforcement officer. <u>See</u> (Tr. at 147-48).

The Kansas authorities meanwhile advised SA Leppla that a shipment of marijuana would be entering his jurisdiction on March 27, 2005 – a date which was Easter Sunday for various Christian faiths. <u>See</u> (Tr. at 148-49). SA Leppla received information that the delivery would occur in Warrensville Heights, Ohio. <u>See</u> (Tr. at 148).

At approximately 6:30 p.m., SA Leppla observed two vehicles – a black Chevrolet Trailblazer and a black/grey Chevrolet Suburban – enter the destination area. <u>See</u> (Tr. at 149). SA Leppla further observed the driver of the Chevrolet Suburban, alleged to be Matthews, exit the vehicle and open a garage door. <u>See</u> (Tr. at 149). The two vehicles entered the garage, and after "about ten minutes", the vehicles departed from the area. <u>See</u> (Tr. at 149).

The law enforcement officers meanwhile equipped Quintana with a microphone as well as a transmitter, and proceeded with the controlled delivery. <u>See</u> (Tr. at 150).

Quintana then arrived at the destination. <u>See</u> (Tr. at 150). Five to ten minutes later, the black Chevrolet Suburban arrived operated by Matthews, followed by the black/grey

Chevrolet Trailblazer operated by Jackson.  See (Tr. at 150).  The defendants exited their vehicles and engaged in an conversation with Quintana near the flatbed trailer.  See (Tr. at 150-51).

SA Leppla immediately became concerned for the surveillance officers' safety as it was growing dark.  See (Tr. at 152-53).  He issued a predetermined signal and the law enforcement officers initiated the arrest of the defendants.  See (Tr. at 152-53).  A subsequent search of the Chevrolet Trailblazer revealed a black duffle bag, three boxes of clear plastic bags, a small amount of marijuana, a tarp, and cellophane sharing characteristics to that covering the marijuana brought from Kansas.  See (Tr. at 153).

The Government closed its opening statement by acknowledging that Quintana was subject to prosecution in Kansas for the offense and that Quintana "will have a choice in that case whether to let it be heard by a jury or plead guilty."  (Tr. at 154.)

*Defendant Jackson's Theory of the Case*

Counsel for Jackson commenced Jackson's theory of the case by advising the jury that Jackson owns and operates a business known as Mobile Wash from the garage referenced in the Government's opening statement.  See (Tr. at 155).  Defense counsel further advised that on March 27, 2005, Jackson arrived at the garage because co-Defendant Matthews had requested him to steam clean the Chevrolet Trailblazer.  See (Tr. at 156).

Defense counsel then presented an alternative theory to that presented by the Government.  He asserted that the Government's "principal and star witness", Quintana had been to Cleveland, Ohio in February 2005 and met Jackson at the garage.  See (Tr. at 156).

-6-

At that time, Jackson had presented Quintana with a business card and invited Quintana to utilize his semi-truck washing services whenever Quintana was in Cleveland.  <u>See</u> (Tr. at 156-57).  Consequently Quintana arrived in Cleveland in mid-March 2005 and Jackson washed Quintana's semi-tractor trailer.  <u>See</u> (Tr. at 157). In providing a rationale for Quintana arriving in late-March with marijuana, defense counsel asserted that "Quintana did not want to expose his true connections elsewhere, and that he singled out Mr. Jackson as a pawn in his deception with the [G]overnment." <u>See</u> (Tr. at 157).  The opening statement concluded with the contention that the tape recording of the alleged transaction did not mention "pickups, deliveries, money or drugs." <u>See</u> (Tr. at 158).

*Defendant Matthews's Theory of the Case*

Counsel for Defendant Matthews briefly restated the Government's theory and advised that Quintana did not provide any description of the marijuana's intended recipients at the time of the Kansas arrest.  <u>See</u> (Tr. at 159).  Counsel for Matthews went on to contend that Matthews did not arrive with Jackson at the garage prior to the arrival of Quintana's semi-tractor trailer – rather, Jackson was accompanied by an individual known as Dartanyan Thompson. <u>See</u> (Tr. at 160).  Matthews thereafter returned with Jackson to the garage for the purposes of cleaning the Chevrolet Trailblazer, as it was a rental vehicle that needed to be returned the following day. <u>See</u> (Tr. at 160).  Additionally, Matthews accompanied Jackson to inspect motorcycle parts that Jackson stored at the garage.  <u>See</u> (Tr. at 161).

Counsel for Matthews advised that the items discovered in the vehicles following the arrest belonged to Matthews's aunt, Chantay Robinson.  <u>See</u> (Tr. at 161).  Furthermore,

Matthews possessed $3,000.00 at the time of his arrest, "[n]ot the amount of money that someone would get for transporting those drugs."  (Tr. at 161.)

Counsel for Matthews summarized his theory that SA Leppla selected the destination, radioed back that destination to the semi-tractor trailer, and "sure enough, this individual [Quintana] comes to that location."  (Tr. at 162.)

Defense counsel also explained that following the arrest, Matthews consented to a search of his home whereby the law enforcement officers discovered luggage tags indicating that Matthews had been to Las Vegas in early-March.  See (Tr. at 162).  Matthews admitted to law enforcement officers that he had been to Arizona, but it "wasn't for a drug deal."  See (Tr. at 162).

The next morning, Quintana advised law enforcement officers for the first time that Matthews had been in Arizona with Guzman on March 15, 2005.  See (Tr. at 163).  Counsel for Matthews advised the jury "[t]hat's not even possible."  See (Tr. at 163).

Counsel for Matthews concluded his opening statement by demonstrating that the Government lacked any photographs or video of the alleged transaction.  See (Tr. at 163).

*SA Leppla's Testimony*

The Government presented SA Leppla as its first witness.  See (Tr. at 148).  SA Leppla testified that late in the night of March 26, 2005/early in the morning of March 27, 2005, he received notice from DEA Acting Group Supervisor, Special Agent Harry Tideswell ("SA Tideswell") in Cleveland, Ohio that a shipment of marijuana would be entering their jurisdiction on March 27, 2005 as part of a controlled delivery.  See (Tr. at 167-69).

-8-

Specifically, SA Leppla was advised that the controlled delivery would occur in the "general vicinity" of Aurora Road in Warrensville Heights, Ohio.  See (Tr. at 168).  SA Leppla was aware that the alleged destination was a commercial area.  See (Tr. at 168-69).  SA Leppla further was aware that SA Tideswell was in communication with the DEA agents in Kansas that were accompanying the semi-tractor trailer (containing the marijuana) to Cleveland.  See (Tr. at 169).

SA Leppla attempted to determine the destination for the marijuana.  See (Tr. at 171). SA Leppla received information that the destination was near a warehouse marked by a parked brown tractor-trailer.  See (Tr. at 171).  Based on that description, SA Leppla traveled to the Aurora Road area at approximately 11:00 a.m on March 27, 2005 and through a "process of elimination", believed that the delivery point was a warehouse, sub-divided into garages, located at 20905 Aurora Road, Warrensville Heights, Ohio.  See (Tr. at 171-72; Gov't's Exs. ## 1-6).  SA Leppla conducted surveillance on the area throughout the remainder of the day.  See (Tr. at 173-74).

SA Leppla testified that at approximately 6:40 p.m., he observed two vehicles – a black Chevrolet Trailblazer and a black/grey Chevrolet Suburban – enter the destination area. See (Tr. at 175-76).  SA Leppla further observed the driver of the Chevrolet Suburban, who he later described as an African-American male wearing a "black puffy jacket", exit the vehicle and open the garage door.   See (Tr. at 176, 179).  The two vehicles entered the garage and each driver then stood in the outside area near the garage's entrance.  See (Tr. at 179).  After conversing "for a few minutes", the drivers returned to their vehicles and

-9-

departed from the area.  <u>See</u> (Tr. at 179).  SA Leppla observed the drivers, who he identified as African-American males, remain at the garage for approximately "fifteen or sixteen" minutes.  <u>See</u> (Tr. at 179).

At approximately 7:10 p.m., SA Leppla observed Quintana arrive at the destination garage and park the semi-tractor trailer parallel to the garage.  <u>See</u> (Tr. at 183, 185-86).  SA Leppla then observed Quintana exit the semi-tractor trailer and wait.  <u>See</u> (Tr. at 187).  Five to ten minutes later, the black Chevrolet Suburban and the black/grey Chevrolet Trailblazer arrived at the location.  <u>See</u> (Tr. at 188).  According to SA Leppla, the Chevrolet Trailblazer parked perpendicular to the garage door.  <u>See</u> (Tr. at 188, 191).  The Chevrolet Suburban parked "ten or fifteen feet" from the side of the semi-tractor trailer.  <u>See</u> (Tr. at 188,191).  The driver of the Chevrolet Suburban, identified as the "larger of the two individuals", walked toward the garage and opened the garage door.  <u>See</u> (Tr. at 189-91).  The driver of the Chevrolet Trailblazer meanwhile approached Quintana.  <u>See</u> (Tr. at 190).  The driver of the Chevrolet Suburban then exited the garage, the three men "meet for a short period of time . . . behind the cab . . .near the [d]river's side", and the "larger of the two individuals" returned to the garage.  <u>See</u> (Tr. at 191-92).  SA Leppla identified the drivers as the "exact same individuals that had arrived earlier."  <u>See</u> (Tr. at 190).

SA Leppla then observed Quintana standing on the flat-bed of the semi-tractor trailer apparently in order to remove the outside canvas straps from the area of the trailer carrying the marijuana.  <u>See</u> (Tr. at 193).  The driver of the Chevrolet Trailblazer appeared to assist Quintana.  <u>See</u> (Tr. at 193).  The driver of the Chevrolet Suburban exited the garage.  <u>See</u> (Tr.

-10-

at 193).

SA Leppla immediately became concerned for the surveillance officers' safety as it was growing dark.  See (Tr. at 50).  Consequently, he requested SA Tideswell to issue a predetermined signal to effectuate the arrest.  See (Tr. at 194).  Approximately six law enforcement officers emerged from the foliage, identified themselves as law enforcement officers, and initiated the arrest of the three men.  See (Tr. at 195).

Law enforcement officers arrested the driver of the Chevrolet Suburban, subsequently identified as Matthews, in the large open bay area of the garage.  See (Tr. at 196).  SA Leppla arrested the driver of the Chevrolet Trailblazer, subsequently identified as Jackson, in a back room located within the garage.  See (Tr. at 197).  A black puffy coat was observed on the floor of the warehouse.  See (Tr. at 197).

A subsequent search of Matthews's person revealed mobile telephones and $3,235.00 in U.S. currency.  See (Tr. at 197).  An additional $500.00 in U.S. currency was found on the floor near Matthews.  See (Tr. at 197).  A search of the Chevrolet Trailblazer that was operated by Jackson revealed a rental agreement issued in the name of Chantay Robinson, a black duffle bag, three boxes of gallon size Glad-zipper bags, and three rolls of contact paper sharing characteristics to that covering the marijuana.  See (Tr. at 204, 215 & Gov't.'s Exs. ## 16 -18  ).

SA Leppla testified that it was his expert opinion with regard to drug trafficking that

-11-

the Glad-zipper bags and contact paper were commonly utilized to repackage marijuana.[2] See

(Tr. at 209-10).  SA Leppla went on to testify that the marijuana weighed approximately 749

pounds.  See (Tr. at 215).  SA Leppla further testified that "[g]enerally, the traffickers will

do everything they possibly can to avoid having the contraband, the drugs, whether it be

marijuana or cocaine,  and the large sum of money used to pay for that at the same location

at the same time."  See (Tr. at 224).  Accordingly, he opined that it was unsurprising that a

------

[2]The Court issued the following instruction to the jury:

DEA Agent Leppla is testifying in this case as a fact witness, and now is
also being allowed to testify as an expert regarding drug trafficking
because of his knowledge and experience.  And such testimony –
remember, you've got to separate his fact testimony and his testimony
now as an expert.  And such testimony is permitted since knowledge of
such activity, drug trafficking, is generally beyond the understanding of
the average layman.  But it's up to you folks to give DEA Special Agent
Leppla's expert opinion the weight that you think it deserves.

See (Tr. at 204).  The Court gave the jury a supplemental instruction:

Although I'm permitting Special Agent Leppla to testify as an expert
because of his experience and knowledge of drug trafficking, it's up to
you, ladies and gentlemen, to give his opinions such weight as you think
they deserve. In deciding how much weight you should give his
opinions, consider his knowledge of the things to which he is testifying
to, and his experience, and how he reached his conclusions.
If you should decide that the opinions that he is giving are not sound or
later on outweighed by other evidence, you may disregard his opinions.
In other words, you don't have to accept the opinions of the expert.  It's
up to you folks to decide.

See (Tr. at 219).

-12-

large sum of money was neither discovered on the defendants' persons nor in the warehouse.
See (Tr. at 224-25).

The Government presented the audio recording of the alleged drug transaction to the
jury and SA Leppla testified as to his preparation of the transcript.  See (Tr. at 226-34 &
Gov't's Exs. ## 13-14 ).

Counsel for Jackson began his cross-examination of SA Leppla by enquiring if
Quintana was de-briefed prior to leaving Kansas.  See (Tr. at 238).  SA Leppla responded that
Task Force Officer Bailiff ("TFO Bailiff") in Kansas had debriefed Quintana in Kansas –
however, SA Leppla had no direct contact with TFO Bailiff prior to the arrest of the
defendants.  See (Tr. at 238).  SA Leppla then described his surveillance of the Aurora Road
location.  He indicated that he did not take any photographs, see (Tr. at 245), that he moved
closer to the garage when the vehicles arrived, see (Tr. at 250), and that he did not have a
description of Jackson, see (Tr. at 251).  In describing his post-arrest investigation of the
alleged drug activity, SA Leppla acknowledged that he did not obtain phone records for the
phones seized from the defendants, see (Tr. at 255), that he lacked any "records that ever
indicated Mr. Jackson contacted Mr. Quintana, Mr. Guzman, anyone", see (Tr. at 255), and
that a search of the garage, as well as a consent search of Jackson's home revealed neither
"drug records" , large sums of currency nor drug paraphernalia.  See (Tr. at 258-59).  SA
Leppla acknowledged that no mention of drugs or marijuana was found on the audio-taped
conversation between Quintana and the defendants.  See (Tr. at 266).

For his part, counsel for Matthews enquired whether SA Leppla had any description

-13-

of Matthews prior to the arrest. <u>See</u> (Tr. at 277).  SA Leppla again testified that he had no description of the intended recipients or the number of recipients. <u>See</u> (Tr. at 277-78). Defense counsel then pressed SA Leppla as to the exact time that the Chevrolet Suburban and Chevrolet Trailblazer first arrived at the garage. <u>See</u> (Tr. at 280).  SA Leppla admitted that he "completely messed up all those times" at the suppression hearing and that the exact time was 6:40 p.m. <u>See</u> (Tr. at 280).  SA Leppla further admitted that he had made varied statements regarding the duration that the two drivers waited at the garage – ranging from 26 minutes (suppression hearing), 10-15 minutes (preliminary hearing) and 15-16 minutes (testimony on direct examination) – and that the accurate period was 15-16 minutes. <u>See</u> (Tr. at 282-83).

SA Leppla again testified as to the nature of his surveillance on the date of the arrests, as well as his post-arrest investigation.  SA Leppla testified that a records check indicated that the Chevrolet Suburban was owned by Dartanyan Thompson. <u>See</u> (Tr. at 297). He also testified that when the vehicles initially arrived, he repositioned himself from a vantage point of 300 yards away from the garage to approximately 75 yards. <u>See</u> (Tr. at 299).  SA Leppla stated that when vehicles arrived for the second time, the Chevrolet Trailblazer arrived first, followed by the Chevrolet Suburban. <u>See</u> (Tr. at 311).  SA Leppla again testified that there lacked any video, photographs, finger-print analysis, or phone records arising from the alleged drug transaction. <u>See</u> (Tr. at 325).  Upon cross-examination regarding the Glad zipper-lock bags and contact paper, SA Leppla opined that the materials were insufficient to repackage all of the marijuana. <u>See</u> (Tr. at 356).

-14-

*Quintana's Testimony*

Following the introduction of expert testimony regarding the testing of the marijuana,[3] the Government called Quintana as a witness.  Quintana, testifying through an interpreter, stated that he was a self-employed truck driver.  See (Tr. at 391).  Upon refreshing his recollection with a statement provided to the DEA in Kansas, Quintana testified that he met Guzman sometime in January 2005 while delivering pipes to Guzman's construction company.  See (Tr. at 412).  Guzman requested that Quintana deliver marijuana in exchange for $25,000.00.  See (Tr. at 417).  Quintana agreed to provide his semi-tractor trailer for the loading of the marijuana in Tucson, Arizona.  See (Tr. at 414-15).

Quintana testified that he met Guzman prior to the loading of the semi-tractor trailer at a truck stop in Arizona.  See (Tr. at 415).  At this meeting, Guzman was introduced to "a black man . . .in the parking lot . . .while the person was in the passenger's seat."  See (Tr. at 416).

The "next day", Quintana left his semi-tractor trailer for loading at an appointed location in Tucson, Arizona.  See (Tr. at 410).  The subsequent day, Quintana picked up the semi-tractor trailer and began his journey to Cleveland, Ohio.  See (Tr. at 419).  Guzman instructed Quintana to travel to Exit 25 of Interstate 480, then "make a right, and at the first light to turn right and then left."  See (Tr. at 396).

---

[3]The government presented the testimony of James Defrancesco, Senior Forensic Chemist at the DEA North Central Laboratory in Chicago, Illinois.  See (Tr. at 372-387).

-15-

Quintana testified that on March 26, 2005 he stopped at a rest area near Emporia, Kansas and encountered law enforcement officers.  See (Tr. at 392-93).  The law enforcement officers were investigating registration numbers and discovered that Quintana's semi-tractor trailer's registration contained an additional digit.  See (Tr. at 394).  The law enforcement officer obtained Quintana's consent to perform a dog-sniff search of the payload.  See (Tr. at 394).  Quintana admitted to the law enforcement officers that there was a load of marijuana concealed in the insulation.  See (Tr. at 395).  Quintana advised the law enforcement officers of the destination and agreed to perform a controlled delivery.  See (Tr. at 396).

Quintana testified that a law enforcement officer drove the semi-tractor trailer to  a police station in Cleveland, Ohio.  See (Tr. at 396-98).  There, Quintana was equipped with a radio transmitter and recorder.  See (Tr. at 399).  He then drove the semi-tractor trailer to the destination provided by Guzman.  See (Tr. at 399).

Quintana testified as to his version of the controlled delivery.  He arrived at the warehouse and waited for the arrival of the recipients.  See (Tr. at 401).  About ten minutes later, two "black" men arrived in a "Station Wagon" and a "Suburban."  See (Tr. at 401).  The pair "greeted" Quintana and asked him to back the truck closer to the garage.  Quintana testified that law enforcement officers previously had instructed him to not back up the truck – consequently, he "told them the transmission was broken and it did not have a reverse."  See (Tr. at 403).  Quintana then advised the pair that he required pliers to cut the banding around the insulation.  See (Tr. at 402).  The "bigger one" entered the garage and the "little man" assisted Quintana with loosening the load.  See (Tr. at 403-404).  Law enforcement

-16-

officers then arrived at the scene and placed Quintana under arrest.  <u>See</u> (Tr. at 407).

Quintana identified the "big guy" as the individual that accompanied Guzman in Tucson, Arizona.

Quintana concluded his testimony on direct examination by acknowledging that he was subject to criminal charges in Kansas arising from this transaction.  He advised that no promises regarding sentencing had been made and that he "hope[d]" the judge would give him favorable treatment.  <u>See</u> (Tr. at 407-08).  Quintana admitted that he had been convicted previously on charges of tampering with identification numbers as well as possession of 60 pounds of marijuana in Arkansas.  <u>See</u> (Tr. at 424).  Quintana further admitted that he was a user of crystal methamphetamine and that he used the drug on the date he met Guzman and the "big man" in Tucson.  <u>See</u> (Tr. at 423).

On cross-examination, counsel for Jackson explored whether Quintana had received any consideration for the testimony presented at trial.  Quintana responded that he was told the testimony may "help a little bit, but not much."  <u>See</u> (Tr. at 430).  Quintana went on to testify that he previously cooperated with the Government upon his arrest for transporting 60 pounds of marijuana.  <u>See</u> (Tr. at 432).  Quintana testified that he received 24 hours in jail for that arrest and a fine.  <u>See</u> (Tr. at 433).  Defense counsel then explored Quintana's admitted history of drug abuse.

Quintana later testified that he had been in Cleveland in January, 2005 because his semi-tractor trailer required repairs.  <u>See</u> (Tr. at 446-47).  He expressly denied visiting Cleveland in either Febraury or March, 2005.  <u>See</u> (Tr. at 446).

-17-

As for his cross-examination, counsel for Matthews enquired as to whether Quintana was aware of the identity of the recipients of the marijuana at the time of the delivery. Quintana testified that he was unaware of their identity.  Counsel explored the alleged meeting between Quintana, Guzman, and Matthews in Arizona.  Quintana could not testify with any certainty whether the meeting occurred on March 13, 14 or 15, 2005.  See (Tr. at 451, 453).  Quintana explicitly testified that he was "not sure about any dates" in regard to the meeting or the date that the trailer was loaded with marijuana.  See (Tr. at 454).  In regard to his identification of Matthews, Quintana testified that "all [he] saw was his face" and that he "couldn't see him that well."  See (Tr. at 460-61).  Quintana testified that Matthews did not have any distinctive features on his face, whereupon defense counsel proffered that Matthews had three distinctive scars on his forehead.  See (Tr. at 461).  Quintana stated, "I didn't pay attention because all they told me was he was the boss, and I turned and looked at him."  See (Tr. at 462).  The following colloquy occurred between counsel for Matthews and Quintana:

> Q.   Yeah but you didn't know what the boss looked like, correct?
> A.   Well, I saw his face, but they all look the same, but I didn't know what size he was until I got here.
> Q.   What does he mean by "they all look the same"?
> A.   Because all black people look the same, and I wasn't paying much attention.
> Q.   If they all look the same, how can he identify one from another?
> A.   Because they told me he was going to be here, and he was here because he came and said hi.
> Q.   Yeah, but you didn't know what he looked like prior to being here on March 27, correct?
> A.   Well, no.  Who I saw, I didn't know if it was him or if it was somebody else.  But whoever was here and greeted me, that was

-18-

the boss.

Q.  Okay.  So you don't know if it was him or not, correct?

A.  Well, Mr. Guzman pointed him out and told me that was the boss an he was going to be waiting for me.

Q.  And you didn't see him standing, correct?

A.  No.

Q.  In Arizona?

A.  No.

Q.  You couldn't get a real good feel for how big he was then, correct?

A.  That's correct.

See (Tr. at 462-63).

*Testimony of Task Force Officers Debra Harrison and Jamaal Ansari*

The Government proceeded to introduce the testimony of Task Force Officers Debra Harrison ("TFO Harrison") and Jamaal Ansari ("TFO Ansari").

TFO Harrison testified that she conducted the search of Chevrolet Trailblazer following the defendants' arrest.  TFO Harrison discovered a rental agreement requiring that the vehicle be returned on March 8, 2005, Glad-zipper lock baggies, contact paper, and a black duffle bag.[4]  See (Tr. at 474-76).  On cross-examination, TFO Harrison testified that no fingerprint analysis had been conducted on the seized evidence.  See (Tr. at 482).

TFO Ansaari testified that he conducted surveillance at the Aurora Road location on March 27, 2005 from approximately 2:30 p.m. until the time of the defendants' arrest.  See (Tr. at 487-88). TFO Ansari testified that approximately "45 minutes" after SA Leppla's

---

[4]The Government intended to introduce evidence that a small amount of marijuana was discovered inside of the bag.  Upon objection from the defendants, the Court precluded any evidence regarding this small amount of marijuana.  See (Tr. at 476-77).

arrival at 6:30 p.m., a "blue Suburban and a dark – I think it was a Chevy – pulled up." See (Tr. at 489).  TFO Ansari testified that the Suburban pulled up to the garage door, the driver wearing a black jacked opened the garage door, and the two vehicles entered the garage.  See (Tr. at 489).  The pair, identified as African American males, stayed "less than ten minutes", and departed.  See (Tr. at 489).

TFO Ansari testified that following the arrival of the semi-tractor trailer, the Suburban arrived and "pulled past the garage door."  See (Tr. at 491).  The other vehicle was obstructed from TFO Ansari's field of view by the semi-tractor trailer.  See (Tr. at 491).  TFO Ansari observed a "brief meeting, shaking hands" between the three drivers, see (Tr. at 493), and witnessed the arrest signal.  TFO Ansari testified that it was his task to secure a ravine near the garage – therefore, he did not participate in the arrest.  See (Tr. at 494).

On March 28, 2005, TFO Ansari transported the defendants from jail to the United States Marshall's Office in Cleveland, Ohio where they were scheduled to meet with a United States Pretrial Services Officers prior to arraignment.  See (Tr. at 495).   En route, TFO Ansari testified that Matthews enquired as to the reasons for his arrest.  See (Tr. at 495). TFO Ansari testified:

> Mr. Matthews asked why he was being arrested and stated that he hadn't done anything.  I then advised him that on the 27th, Special Agent Leppla had advised him of his Miranda rights.  I then advised him and Mr. Jackson again of their Miranda rights, and I said, "Here's a clue: Have you ever been to Tucson?"
> . . .
> His statement to me was, yes, he had been in Tucson but that he didn't go there to make a deal.
> I advised Mr. Matthews, I didn't say that he made a deal.

He asked, wasn't he free to go to Tucson?
I said, you can go wherever you want to go, but just remember, you said you
were in Tucson and about a deal.  I didn't say anything about a deal.

(Tr. at 495-96.)

On cross-examination, counsel for Jackson enquired to the number of officers involved

in the arrest whereupon TFO Ansari replied ten to fourteen.  See (Tr. at 497).  Counsel for

Jackson further enquired as to whether TFO Ansari had observed any other vehicles at the

Aurora Road location during his surveillance.  TFO Ansari responded that a semi-truck had

arrived at the location in the early evening. A pick-up truck subsequently arrived, the semi

truck's driver entered the pick-up truck, and the pair departed.  See (Tr. at 501).  TFO Ansari

testified that the drivers of those vehicles were "long gone" by the time the Chevrolet

Trailblazer and Chevrolet Suburban initially arrived at the scene.  See (Tr. at 501).

Upon further cross-examination, counsel for Matthews explored TFO Ansari's

surveillance of the garage.  Specifically, Ansari testified that the Chevrolet Suburban

appeared to be "navy-blue", see (Tr. at 508), and that the defendants ran from the scene at the

time the arrest signal was issued, see (Tr. at 510).

*Stipulation and the Government's Resting of its Case*

The parties thereafter entered a stipulation into the record. The stipulation provided:

If Sharon Ginther were called to testify she would state that she is an employee
of America West Airlines, 4000 East Sky Harbor, Boulevard, Phoenix,
Arizona.  As such, she is charged with keeping the records of America West
Airlines as it relates to the travel of passengers on that airline.  She would
testify and it is stipulated that the defendant, Ernest Matthews, departed
Cleveland on an America West Airlines flight on March 1, 2005 for Las Vegas,
Nevada.  On March 13, 2005, the defendant, Ernest Matthews, departed Las

-21-

Vegas,  Nevada on an America West Airlines flight and arrived in Cleveland
in the early morning hours of March 14, 2005.

(Tr. at 517; Gov't's Ex. # 22).

The Government submitted its exhibits into the record and rested its case in chief.  The

defendants jointly moved for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules

of Criminal Procedure.  See (Tr. at 522-24).  The Court denied the motions.  See (Tr. at 525-

26).

*Testimony of Gregory Robitson*

The defendants elected to present a defense.  Jackson advanced the testimony of

Gregory Robitson, a former employee of Mobile Wash.  See (Tr. at 528).  Robitson testified

that he was employed at Mobile Wash by Jackson and cleaned with high pressure instruments

various fixtures including restaurant stoves/hoodings and floors.  See (Tr. at 528- & Def.'s

Exs. ## 1-10, 26-31).  Robitson further testified that he washed a "couple" of semi-trucks

during his employment at Mobile Wash.  See (Tr. at 545).  According to Robitson, he washed

a "red-semi" in March 2005 that was owned by a "[d]ude that had a strong accent."  See (Tr.

at 553).  Nevertheless, Robitson testified that he did not speak with the owner of the semi-

truck and he was "not sure" if Jackson talked with the owner at that time.  See (Tr. at 557).

On cross-examination, the Government enquired at to whether Robitson had talked

with Jackson since the date of Jackson's arrest whereupon Robitson responded in the

affirmative – nevertheless, he qualified that it was "nothing serious."  See (Tr. at 561).

Robitson further testified that he could not remember any details regarding the make and

model of the red semi-tractor trailer, nor any writing on the side of the trailer.  See (Tr. at 564-65).

### Testimony of Chantay Robinson

Matthews presented as the next witness his aunt, Chantay Robinson.  Robinson testified that she traveled to Las Vegas in March 2005 with Matthews, Matthews's girlfriend Cynthia Harris, her son Fred, her brother Frank Robinson, and a friend Damon Wheat.  See (Tr. at 573-577).  Robinson further testified that she had been in an automobile accident prior to the trip and rented a replacement vehicle, a black/grey Chevrolet Trailblazer.  She stored in the rear of the rental vehicle the following: (1) Glad zipper-lock bags that she utilized for food storage; (2) rolls of contact paper for ongoing home improvement projects; and (3) a black duffle bag for use in her employment as a nurse.  See (Tr. at 580-84).

Robinson went on the describe the events preceding the defendants' arrests.  Specifically, Robinson hosted Easter dinner for her family that was attended by her brother, sister and Matthews, as well as several friends, including Jackson.  See (Tr. at 585-89).  At some point in the evening, Robinson requested Matthews to take the vehicle to Jackson's garage and wash the vehicle as it was required to be returned the following day.  See (Tr. at 587-589).

### Testimony of Dartanyan Thompson

Matthews next presented Dartanyan Thompson as a witness.  Thompson testified that he was a friend of the defendants and attended Robinson's Easter dinner.  See (Tr. at 594-95).  At some point during the dinner, he exited and drove his Chevrolet Suburban to Jackson's

garage in order to inspect motorcycle parts as well as mobile washing machines. <u>See</u> (Tr. at 595-96). Jackson followed in a Chevrolet Trailblazer. <u>See</u> (Tr. at 596). The pair remained at Jackson's garage for "15, 20 minutes" and returned to Robinson's home. <u>See</u> (Tr. at 597).

Matthews subsequently borrowed Thompson's Chevrolet Suburban in order to accompany Jackson to the garage. <u>See</u> (Tr. at 599-600). Thompson opined that Matthews borrowed his vehicle because the Chevrolet Suburban was the last car parked in the driveway. <u>See</u> (Tr. at 599-600).

On cross-examination, the Government enquired as to the events preceding the arrest. Thompson was unable to recall details regarding the time that he ate dinner and the defendants' and his clothing. <u>See</u> (Tr. at 606-608). Additionally, Thompson testified that he had talked to Jackson since the arrest "three or four" times and that they discussed the pending case. <u>See</u> (Tr. at 608).

### Testimony of Tom Pavlish

Matthews then presented as a witness Tom Pavlish. Testifying in his capacity as a private investigator, Pavlish testified that he took photographs of the defendants' clothing as well as the interior of the garage following the arrest. <u>See</u> (Tr. at 615-618). His photos included a "blueish green" pair of pants and a blue sweatshirt. <u>See</u> (Tr. at 616).

### Testimony of Cynthia Harris

Matthews next presented the testimony of his girlfriend, Cynthia Harris. Harris testified that she and Matthew traveled to Las Vegas on March 1, 2005 and returned to Cleveland, Ohio on March 14, 2005. <u>See</u> (Tr. at 625-26). During the trip, Matthews and

-24-

Harris traveled to Phoenix and Tucson in order that Harris could interview for employment. See (Tr. at 626). The pair were in Phoenix on March 6-7, 2005, arrived in Tucson later on March 7, 2005, and departed two days later.  See (Tr. at 631-33).  Matthews and Harris did not leave each other's company while in Tucson and Matthews did not attend any meetings at a truck stop.  See (Tr. at 635).

*The Defendants' Resting of their Case*

The defendants then submitted their exhibits and rested their cases.  The defendants reasserted their Rule 29 motions, and the Court denied the same.

*Closing Statements*

The Government presented its closing statement and restated its theory of the case. Defense counsel presented their closing statement with each party devoting a substantial effort to attacking Quintana's credibility.

*The Verdict and the Present Motions*

The jury returned verdicts against each defendant on September 19, 2005.  The Court accepted the verdicts and ordered the same verdicts filed.

The present motions ensued.

## II.    Rule 29 Motion for Judgment of Acquittal

The defendants' initial claim is there was insufficient evidence to support the convictions and the verdicts were contrary to the weight of the evidence.  Whether viewed under a sufficiency of evidence standard, Jackson v. Virginia, 443 U.S. 307, 319 (1979), or a manifest weight of evidence standard, United States v. Ashworth, 836 F.2d 260, 266 (6th

Cir. 1988), the defendants contend that the evidence was inadequate to support the convictions for attempted possession with the intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B).

When considering a challenge to the sufficiency of evidence to sustain a conviction, the relevant question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.  The Court must view all evidence and resolve all reasonable inferences in favor of the government. Id; see also, United States v. Searan, 259 F.3d 434, 441 (6th Cir. 2001).  Because the issue is one of legal sufficiency, the Court may neither "independently weigh[] the evidence, nor judge[] the credibility of witnesses who testified at trial." United States v. Talley, 164 F.3d 989, 996 (6th Cir. 1999).   Neither may the Court substitute its judgment for that of the jury.  See United States v. Hilliard, 11 F.3d 618, 620 (6th Cir. 1993).  Finally, "circumstantial evidence alone can sustain a guilty verdict and . . . [such] evidence need not remove every reasonable hypothesis except that of guilt." United States v. Stone, 748 F.2d 361, 362 (6th Cir. 1984).

In order to convict a defendant under 21 U.S.C. § 841(a) (1), the government must prove beyond a reasonable doubt that the defendant (1) knowingly, (2) possessed a controlled substance, (3) with intent to distribute it.  See United States v. Jackson, 55 F.3d 1219, 1225 (6th Cir. 1995) (citing United States v. Peters, 15 F.3d 540, 544 (6th Cir. 1994)).  To convict a defendant of attempt, the government must prove (1) the defendant's intent to commit the criminal activity; and (2) that the defendant committed an overt act that constitutes a "substantial step" toward commission of the crime. United States v. Bilderbeck, 163 F.3d

-26-

971, 975 (6th Cir. 1999).

The application of the foregoing standard to the case at bar reveals that the defendants' Rule 29 motions are without legal or factual support.  The undisputed evidence presents compelling factors supporting the convictions.  It was undisputed at trial that a semi-tractor trailer containing more than seven hundred pounds of marijuana departed Arizona and ultimately arrived at Jackson's garage.  It was further undisputed that Jackson arrived at the garage prior to the arrival of the marijuana.  Additionally, it is undisputed that Matthews and Jackson appeared at the garage shortly after the arrival of the marijuana and held conversations with the driver of the semi-tractor trailer.  Moreover, it was undisputed that the pertinent events occurred on Easter Sunday at a time when there would be a less chance of observation by third parties.

The evidence presented by the Government further supports the convictions.  At least two officers witnessed a figure fitting Matthews's description appear with Jackson at the garage prior to the marijuana's arrival.   Additionally, SA Leppla observed Jackson begin to assist Quintana with the removal of the straps from the area of the semi-tractor trailer containing marijuana.  An audio-recording of the conversation between Jackson and Quintana lacks any explicit mention of drugs – however, it is uncontroverted that Jackson attempted to have Quintana back the semi-tractor trailer nearer to the garage and that he was concerned with suspected on-lookers.  Furthermore, SA Leppla testified as an expert in drug trafficking that the evidence seized from the Chevrolet Trailblazer – including, a tarp, contact paper, and Glad zipper-lock plastic bags – were consistent with marijuana trafficking.

-27-

In short, the Government presented evidence that (1) the defendants appeared at the garage in preparation for the arrival of the semi-tractor trailer; (2) the semi-tractor trailer arrived at the destination; (3) the defendants again appeared shortly after the arrival of the semi-tractor trailer; (4) the defendants held a discussion with the driver of the semi-tractor trailer; (5) Jackson appeared to assist with the removal of the marijuana from the semi-tractor trailer; and (6) the defendants had in their possession items utilized in drug trafficking. Moreover, the Government presented the testimony of Quintana that suggested that Matthews had appeared in Arizona with the alleged source of the marijuana several week earlier.

The defendants attempt to challenge the evidence by arguing that SA Leppla and TFO Ansari presented different accounts of the events preceding the arrest. The defendants additionally emphasize the lack of any evidence describing them as the intended recipients of the marijuana. Furthermore, the defendants repeatedly stress that they never observed the marijuana.

A review of the entirety of the record reveals that SA Leppla presented an account that differed from TFO Ansari's in several respects. First, SA Leppla and TFO Ansari testified differently as to which vehicle – the Chevrolet Suburban or the Chevrolet Trailblazer – appeared first at the garage. Similarly, SA Leppla testified that there was little traffic near the garage on the date of the arrest, while TFO Ansari testified to the events surrounding the semi-tractor trailer driver being pick-uped by a white pick-up truck. SA Leppla also testified that he did not observe the defendants run at the time of the arrest, while TFO Ansari testified that he observed the defendants run toward the garage. Nonetheless, these distinctions were

-28-

emphasized by the defendants during cross-examination.  They merely address the credibility of the defendants – a factor this Court is prohibited from considering under Rule 29.

Likewise, the lack of any reference to "marijuana" on the audio-recording or any direct testimony indicating that the marijuana was exposed to the defendants does not necessarily negate the inferences to be drawn from the other evidence presented in the record.  These alleged deficiencies were presented and emphasized by the defendants during cross-examination. The defendants further advanced alternative theories for their appearance at the garage as well as the existence of evidence such as the contact paper, Glad zipper-lock plastic bags, and the bag.

Taking the evidence in the light most favorable to the Government, the Court finds that a rational juror could conclude beyond a reasonable doubt that Jackson's and Matthews's independent conduct, when viewed objectively, unequivocally corroborates their individual and  subjective intent to commit the crime as charged. As a result, the Court finds that  there was sufficient evidence presented at trial to support their convictions for attempted possession with the intent to distribute marijuana.

## III.    Rule 33 Motion for New Trial

The defendants request a new trial pursuant to Rule 33 of the Criminal Rules of Federal Procedure.  Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a).  When presented with a Rule 33 motion, the district court may weigh the evidence and assess the credibility of the witnesses; "it has often

-29-

been said that [it] sits as a thirteenth juror." United States v. Solorio, 337 F.3d 580, 589 n.6 (6th Cir. 2003) (internal citations omitted).

The defendants' motions seek a new trial citing various instances of newly-discovered evidence.  To warrant a new trial on the basis of newly-discovered evidence, the defendants generally must establish: "(1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal." United States v. Jones, 399 F.3d 640, 648 (6th Cir. 2005) (citing United States v. O'Dell, 805 F.2d 637, 640 (6th Cir. 1986)).

The Court shall consider each of the defendants' assertions in turn.

*The Government's Purported Brady Violations*

The defendants repeatedly have asserted throughout the proceedings that the Government has violated various discovery rules by failing to provide a statement made by Quintana following his arrest in Kansas.  The matter was the subject of multiple discussions at trial and was fully addressed by the Court at that time.  In short, the Government provided a packet to defense counsel immediately prior to jury selection indicating that it was Jencks material. See (Tr. at 7-8).  Included in this material, *inter alia*, was a report prepared by TFO Bailiff therein referring to statements made by Quintana following his arrest.      Defense counsel suggested that this material was exculpatory Brady material as Quintana did not have any description of the defendants and that, notwithstanding, that  Quintana indicated that he would be compensated in the amount of $25,000.00 for delivering the marijuana,   the

-30-

defendants possessed approximately $3,500.00 at the time of their arrest.  <u>See</u> (Tr. at 136-137).  The Court agreed that the information may be "beneficial" to the defendants and ordered the defendants to hold Quintana in the immediate area for potential re-cross examination by the defendants.  As the Government intended to call Quintana on Wednesday, the Court ordered the Government to hold Quintana until the following Monday thereby providing the defendants with the opportunity to review the material over the weekend.  <u>See</u> (Tr. at 208-10).  The defendants did not recall Quintana as a witness.

In spite of the defendants' repeated and lengthy arguments regarding the late disclosure by the Government of the purported <u>Jencks</u> and <u>Brady</u> material, their legal argument lacks merit.  It is well-settled that in the context of a motion for new trial that the defendants' burden is less rigorous where, as here, the new evidence is exculpatory evidence which the Government failed to turn over in violation of the requirements of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  <u>See</u> <u>United States v. Frost</u>, 125 F.3d 346, 382 (6th Cir. 1997).  To warrant a new trial arising from a <u>Brady</u> violation, (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the [government], either willfully or inadvertently;" and (3) "prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  Prejudice (or materiality) is established by showing that "there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense."  <u>Strickler</u>, 527 U.S. at 289.  "A reasonable probability is one sufficient to undermine confidence in the outcome."  <u>United States v.</u>

Phillip, 948 F.2d 241, 249 (6th Cir. 1991) (internal quotation omitted). Thus, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Strickler, 527 U.S. at 289-90.

This Court need not resolve whether the information presented in the material was exculpatory information subject to Brady's disclosure requirements. Faced with the potential that the Government had failed to meet its Brady obligations, the Court employed the approach endorsed by the United States Court of Appeals for the Sixth Circuit in United States v. Davis, 306 F.3d 398 (6th Cir. 2002) and United States v. Patrick, 965 F.2d 1390 (6th Cir. 1992). There, the court held that a no prejudice arises from a tardy Brady or Jencks disclosure where the court provides the defendant with the opportunity to recall the witness for cross-examination upon reviewing the materials. See Davis, 306 F.3d at 421; Patrick, 965 F.2d at 400; see also United States v. Blackwell, 459 F.3d 739, 760 (6th Cir. 2006) ("No Brady violation occurred in this case. The Defendant received all three documents during trial. Furthermore, the district court expressly granted Defendant the opportunity to re-cross examine Stephan-Blackwell and took no action to prevent Defendant from calling Benoit as a witness. Accordingly, Defendant had the opportunity to examine both Stephan-Blackwell and Benoit in light of the disclosed documents and any prejudice resulting from Defendant's failure to do so is not attributable to the government's violation of the principles set forth in Brady.") (Internal citations and quotations omitted).

In the present case, the Court provided the defendants with the opportunity to re-call

Quintana following a review of the information provided by the Government.  The defendants neither recalled Quintana, nor advised the Court that additional time was necessary to review the materials.  In an attempt to demonstrate *any* prejudice, the defendants presently suggest that they would have subpoenaed TFO Bailiff had they possessed this information prior to trial.  The argument is spurious at best.  All parties to this case were aware from the date of the preliminary hearing that Quintana had been arrested in Kansas.  It was reasonable to conclude that TFO Bailiff – identified throughout the preliminary and suppression hearings as the agent in Kansas that traveled with Quintana to Cleveland – may have information relevant to the case.  Nonetheless, at no time during the pre-trial or trial proceedings did the defendants express an intention to subpoena TFO Bailiff.  Accordingly, the defendants are precluded from raising the issue at this late stage.

The Court reaches a similar conclusion regarding the defendants' claims that the Government failed to disclose a tape recording of a telephone conversation made between Quintana and Guzman following the Kansas arrest.  It is undisputed that the existence of the tape recording was not disclosed until the material was provided to the defendants.  See Kyles v. Whitley, 514 U.S. 419, 433 (1995) (finding that the constitutional duty of disclosure attaches regardless of the government's good or bad faith, and regardless of whether the defense requested that evidence or failed to make any request at all).  It is further undisputed that the audiotape is completely inaudible.  The Court agrees with the defendants that the issue of inaudibility should have been made by the Court.  The Court further agrees that prudence commands that the Government disclose the existence of such a tape to the

-33-

defendant. While it is well-settled that the government "has no <u>Brady</u> obligation to 'communicate preliminary, challenged, or speculative information'", <u>United States v. Diaz</u>, 922 F.2d 998, 1006 (2d Cir.1990) (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 109 n. 16 (1976) (citations omitted)), the government maintains an "affirmative duty to resolve doubtful questions in favor of disclosure", <u>Agurs</u>, 427 U.S. at 106.

However, the defendants' arguments in support of a new trial again fail as a matter of law. First, as discussed *supra*, the principles of <u>Brady</u> are not violated by a tardy disclosure. <u>See</u> <u>United States v. Blood</u>, 435 F.3d 612, 627 (6th Cir. 2006) ("Brady generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose" and [] a "[d]elay only violates Brady when the delay itself causes prejudice") (quotation marks and citation omitted). The defendants concede that they possessed information regarding the existence of the tape upon the Government's disclosure of the purported <u>Jencks</u> material. However, they did not become aware of the matter until after they "re-examined" the documents post-trial. Consequently, this was not "newly discovered" evidence as required pursuant to Rule 33. Secondly, as the tape was inaudible, the defendants are unable to demonstrate any prejudice emanating from the Government's failure to disclose. While the defendants assert that they would have utilized such evidence to further demonstrate the alleged ineptness of the Government's investigation, such evidence would have been cumulative in light of their persistent attempts to demonstrate the lack of any photographic, video, and telephonic evidence during the cross-examination of the Government's witnesses.

-34-

*The Purported Plea Agreement Between Quintana and Kansas Authorities*

The defendants raised in their post trial motions and memoranda the notion that the Government and the state authorities in Kansas had colluded to provide Quintana with a reduced sentence in his state proceedings in exchange for his co-operation in the federal matter.  When the issue was raised during trial, AUSA Barr advised the Court outside of the presence of the jury that she had communicated with state authorities in Kansas, who in turn advised her that Quintana was required to enter a plea of guilty or proceed to trial.  As discussed *supra*, the Court permitted defense counsel to enquire into the state proceedings during Quintana's cross-examination.  The Court instructed the jury during the cross-examination of Quintana and at the close of the evidence to exercise caution when considering Quintana's testimony in light of the potential consideration offered by state authorities.  After the trial, defense counsel received correspondence from authorities in Kansas that all charges had been dismissed against Quintana.

The parties explored the issue during the post-trial hearing.  The record before the Court reveals no evidence suggesting that AUSA Barr had any contact or communication with the Kansas authorities regarding an offer of consideration for Quintana's testimony in the federal proceedings.  Accordingly, the defendants' arguments lack merit.

*Quintana's False Testimony*

A review of the post-trial filings reveals the defendants' central contention that Quintana's testimony was patently false.  Notwithstanding the volumes of filings and evidence presented to the Court, the issue is relatively straightforward. Quintana testified that

-35-

he had visited Cleveland, Ohio in January 2005 to have a truck repaired.  He further testified that he had not visited Cleveland at any other time prior to the arrest.  Moreover, Quintana testified that he met Matthews in Cleveland in mid-March 2005 (specifically March 15th, although he was unsure regarding the exact date) and the semi-tractor trailer was loaded with marijuana the following day.

The defendants have presented the Court with evidence – including hotel reservations, credit card receipts, bills and expert handwriting analyses – demonstrating a substantial likelihood that Quintana's allegations regarding his visits to Cleveland, Ohio and his meeting with Matthews and Guzman were false.  Beyond damaging the credibility of Quintana's entire testimony, the newly discovered evidence is relevant in two significant respects: (1) it demonstrates that Quintana could not have met with Matthews on March 15, 2005 as he was in Cleveland, Ohio; and (2) Quintana's presence in Cleveland, Ohio in March, 2005 (and most likely February) provides corroboration to Jackson's claim that he washed Quintana's semi-tractor trailer in March, 2005.

This Court need not delve into the procedural gymnastics that the parties have raised concerning whether the defendants could have discovered this evidence at an earlier date by issuing trial subpoenas or that the defendants may have been aware of Quintana's visits to these hotels prior to trial.  The Court is faced with a Government witness that by any reasonable interpretation of the current record before the Court presented false testimony.

The Court determines, however, that Quintana's purportedly false testimony does not undermine confidence in the verdict in this case.  Having heard the testimony and evidence

-36-

at trial, and the benefit on extensively examining the record in this case, the Court finds that newly-discovered evidence is merely cumulative and impeaching to the extent that it pertains to the dates and meeting with Guzman and Matthews.  Succinctly stated – defense counsel fatally damaged Quintana's credibility throughout their cross-examination.  As discussed *supra*, Quintana could not remember dates,; he held a sporadic memory of any events; he lacked any ability to identify Matthews notwithstanding severe scarring on Matthews's forehead; he admitted to using crystal methamphetamine during important events; and he had prior convictions for drug use.  As further discussed *supra*, Quintana admitted to previously cooperating with the Government in a drug case and that he "hoped" for cooperation in the current case.  Indeed, as the defendants suggest in other portions of the present motions, Quintana's trial testimony, on its face, was inherently lacking in credibility.  As a result, any additional evidence regarding the falsity of the alleged meeting between Quintana, Guzman and Matthews is cumulative.

The Court therefore must determine whether the addition of the other aspects of the newly discovered evidence – particularly Quintana's visits to Cleveland throughout early 2005 – would impact the verdicts in this case.  At first blush, Quintana's visit to Cleveland appears to support the evidence adduced at trial regarding Jackson's and Robitson's washing of the semi-tractor trailer in mid-March 2005.  In theory, this evidence supports Jackson's assertion that upon the arrest in Kansas, Quintana desired to conceal the true destination of the marijuana and merely selected Cleveland because he had been there recently to have his semi-tractor trailer washed.  However, an extensive review of the record reveals a significant

-37-

shortcoming in this theory.  Robitson's testimony does not support the defense's arguments.  Robitson provided no details regarding the semi-tractor trailer that he washed other than it being red.  His testimony was inconsistent as he suggested that the owner had a Spanish accent – yet, he did not speak to the owner nor could he recall if anyone else engaged in conversation.  Assuming that the evidence of Quintana's visit was included into the record, it would be a leap in speculation for the jury to accept Jackson's theory of the case.

The newly-discovered evidence undeniably strikes at the credibility of Quintana's entire testimony.  Assuming *arguendo* that all portions of Quintana's testimony are removed from the record except those that are undisputed – i.e., that he was arrested in Kansas with more than 700 pounds of marijuana, and that he traveled to Jackson's garage with the marijuana – the question before the Court is whether the convictions stand.  The Court answers this enquiry in the affirmative.  As discussed *supra*, Quintana's testimony regarding his alleged meeting with Guzman and Matthews was lacking in credibility and was subject to little, if any, weight by the jury.  As further discussed *supra*, there was substantial undisputed evidence linking Jackson and Matthews to the marijuana such as their timely arrivals to the garage on Easter Sunday.   The jury was instructed to engage in these considerations in their  thorough review of all the evidence.

As a result, this Court will not disturb the conclusions reached by the jury following a painstaking and well-reasoned analysis of the evidence.  See, e.g., United States v. Sullivan, 431 F.3d 976, 985-86 (6th Cir. 2005) (finding no Brady violation where government became aware of allegedly exculpatory DNA samples post-trial, but conviction nevertheless worthy

-38-

of confidence in light of other corroborating evidence).

Accordingly, the foregoing motions for new trial are **DENIED**.

**IT IS SO ORDERED**.

 s/ Peter C. Economus - October 23, 2006
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**